## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

GREGG MARCHAND,                                    3:11 - CV - 348 (TLM)

　　　　　　　Plaintiff,

　v.

ERIK SIMONSON, CITY OF
WILLIMANTIC, and TOWN OF                   **DECEMBER 30, 2013**
WINDHAM,

　　　　　　　Defendants.

## RULING AND ORDER

**HAIGHT, Senior District Judge:**

　　　　This civil rights and false arrest action was commenced by Plaintiff Gregg Marchand against Defendants Erik Simonson, a police officer, and the City of Willimantic and Town of Windham, Connecticut, on whose Police Department Simonson was serving at the times pertinent to the action.

　　　　The action arises out of a confrontation between Marchand and Simonson that occurred during the early evening hours of March 8, 2008, in front of and inside Marchand's home.  There is no dispute that during that confrontation, Simonson "tasered" Gregg Marchand and then arrested him.  The verb "tasered" means that Simonson drew the taser gun (produced by a company called Taser International) with which he was equipped, applied the gun's wired prongs to Marchand's back, and pulled the trigger.  The gun produced a jolt which had the desired effect of knocking Marchand down. Simonson then arrested Marchand.  Criminal charges against Plaintiff were ultimately *nolled*.

1

Plaintiff sues the Defendants for damages caused by the incident of March 8, 2008.

Some pre-trial discovery has been conducted.  The case has been assigned for all purposes including trial to District Judge Tucker L. Melançon, except that the undersigned, to whom the case was originally assigned, retained it for one limited purpose, specifically, to consider Plaintiff's assertion that the operation of the taser gun produced video data which would reveal what actually occurred during the incident, and which Defendants were wrongfully refusing to produce in discovery.  Such a video depiction of the relevant events would be of obvious probative value, since Simonson and Marchand give predictably differing accounts of what happened during the incident in suit.

That issue, seemingly simple enough at first blush, has become surprisingly complicated.  I filed two Rulings with respect to it [Doc. 121 and Doc. 141], familiarity with which is assumed, and conducted two transcribed hearings, on August 21, 2013 and November 6, 2013.  I have considered the several briefs of counsel on this issue; read e-mail exchanges between counsel as disputes escalated; read affidavits executed by Robert Sanderson, Plaintiff's proposed expert on taser guns and their video-generating capacities; and most recently, examined a CD of the video data produced by Defendants, which is said to constitute all the available evidence generated by officer Simonson's taser gun during the incident in suit.

At the end of the August 21 hearing, representations made by counsel for the Defendants stated that the taser gun's video data, which counsel had repeatedly said over a number of months could not be located, had in fact just been located (as the result, one is given to understand, by counsel's persistence in pressing Police Department officials to find the data if at all possible).  The August 21 hearing ended on the cheerful note that Plaintiff, his counsel, and Sanderson, his taser

expert, would all be made welcome at the Willimantic Police Department headquarters, where the relevant taser gun video data would be made available for inspection and copying, and all attendant mysteries resolved.

What happened instead was an increasingly acerbic exchange of attorneys' e-mails and an abandonment of the contemplated inspection, principally (according to Defendants) because Plaintiff's expert, Sanderson, made unreasonable demands about taser-related information the Police Department should produce (which, according to Plaintiff, was necessary to authenticate what was shown and verify its completeness). The Court conducted another hearing on November 6 in order to explore the status. Counsel appeared – Mr. Horvack for Plaintiff, Mr. Dembiczak for Defendants. They stated their present perceptions at length. Counsel's perceptions were based primarily upon what their respective experts had advised them: Robert Sanderson for Plaintiff, an unnamed expert employed by Taser International for Defendants. Counsel's descriptions of what their experts had advised are accepted by the Court as representations by officers of the Court.

The case for Defendants is that many of the production demands put forward by Sanderson proceed from a misunderstanding of how the taser equipment in question functions. Defendants' counsel is advised by Police Department technicians and a Taser International expert. Based on that advice, Defendants' counsel stated at the November 6 hearing that the taser gun Simonson used during the incident in suit has a video camera function which begins to operate when the officer deploying the gun activates the gun  by turning it on (using an on-off switch or pulling the trigger, the evidence in the record is not clear). Once turned on, the camera in the gun records events and sounds within its range (video and audio components) and continues to do so without interruption until the gun is turned off. The data recorded during the interval between switching the gun on and

3

off is referred to as a "clip."

During the hearing, Defendants' counsel described a three-step process by which the evidence generated by the gun camera is preserved.  Stage 1, in counsel's formulation, consists of the contemporaneous recording of events as they occur after the gun is turned on and before it is turned off.  The officer who used the gun then gives it to a police technician at headquarters for the purpose of uploading the recorded data from the taser gun to a laboratory computer, a facility known as the "taser cam library."  That is Stage 2.[1]  What is preserved may then be transferred from the taser cam library to a CD (while preserving what is on the cam library).  That is Stage 3.

The Taser International expert advises Defendants' counsel that there is no way to edit or alter the recorded data as it originally exists in the taser gun itself (Stage 1) or is uploaded from the gun into the taser cam library (Stage 2).  The transfer of recorded data from taser guns to a taser cam library is necessary for the preservation of evidence because the recording equipment in the gun records for a total of 1.5 hours and then begins to rewrite itself, eliminating what was there before.[2]  Counsel for Defendants say that they have turned over to Plaintiff and his counsel a CD that the Police Department made from material contained in the Department's taser cam library: recorded video data which, it follows from the Taser International expert's advice previously summarized, could not have been edited or altered as that data progressed on its technology-driven passage from

---

[1]   I have used the verb *uploading* because counsel used it during the hearing.  Perhaps the more correct word is *downloading*.  I do not know, this is not my language.  In Old English, the process would be called *transferring* what is on the gun camera to the taser cam library.

[2]   1.5 hours does not sound like a long time, but counsel for Defendants stated at the November 6 hearing that typically a taser gun in use (that is to say, turned on and then turned off by the deploying officer) "only records in 10, 15, 20 seconds, a minute here, a minute there," so that "1.5 hours in their practice is probably two years, a year and a half worth of video."  Tr. 38.

the taser gun camera in use during the incident in suit to the taser cam library (and thence to the CD).

At the November 6 hearing, Mr. Dembiczak contended for Defendants that in these circumstances, Defendants had produced to Plaintiff everything there is to produce with respect to recordings generated by the taser gun officer Simonson used during the incident in suit. I will quote from counsel's remarks:

> What we did is because that meeting never happened, I still went to the police department. And we personally videotaped the officer opening up the program, locating the file and playing the file. There's a video of that. And it shows that that video, in the taser cam library, when compared to the video produced previously in discovery is exactly the same. . . .

> That he [Plaintiff's expert , Sanderson] wants to see taser incidents, other taser incidents. This is where the fundamental misunderstanding comes in. He thinks there are various clips of this incident. That's not how it works. There's one video of this incident. That's how this works. It's not pieces. It's all or none. . . .

> Are they saying clips of other incidents? If so, that's not relevant to this case. If they're saying the clips of this incident, that shows a fundamental misunderstanding of how this technology works. It's not downloaded in clips. It's downloaded in one whole file. . . .

November 6 Hearing Transcript ("Tr.") at 50, 55, 56. A victim of my imperfect understanding, I intervened and this exchange occurred:

> THE COURT: You've said one thing and I wanted to follow up on it. I may have misunderstood. That when a taser is actually deployed and the police officer pulls a trigger he's starting to use the taser, you said there was, what, a five-second burst or something in the camera?

> MR. DEMBICZAK: No, no, no. Five-second burst of the taser. So, if you pull the trigger –

> THE COURT: Oh, the taser?

5

MR. DEMBICZAK:  – and the darts go in, it's a five-second cycle.

THE COURT:  Oh, I see.  But the camera, I take it, is –

MR. DEMBICZAK: The camera is always on.

THE COURT: Always on.

MR. DEMBICZAK: From power on to power off.

THE COURT: To power off?

MR. DEMBICZAK: Camera is videotaping.

THE COURT:  I see, I see.

MR. DEMBICZAK: And put it this way: *If the officer turned the camera off and then turned it on again, there would be multiple clips. And when we reviewed the taser cam library,* which we are willing to show the Plaintiff, *you see one clip on that date*.  That's it.  And, again, you can't upload only portions of it.

Tr. 56-57 (emphasis added).

I am grateful to counsel for his patience in dealing with a jurist whose understanding of contemporary technology is manifestly limited.  Subsequent to the November 6 hearing, I viewed in Chambers the CD the Defendants produced in the manner described, and notwithstanding my self-confessed limitations, certain questions occur to me.  Those questions arise in the following manner:

The CD begins with a close up of a computer screen designated as that of Lieutenant Raymond R. Evans (badge 233) of the Willimantic Police Department.  Someone (perhaps Evans, perhaps someone else) clicks to access the relevant taser library to show the footage of March 8, 2008.  The CD shows the taser library display up close, so that it fills almost the entire screen of the Chambers desktop computer.  The library display identifies the taser gun in question as serial number

6

V06-020156.  A section of entries at the top of the library display is captioned "firing data."  There

are three listings for the night of March 7-March 8, 2008.  They are separately numbered #44, #45,

and #46.  The following entries appear in  the taser library display with respect to what appear to be

the timings of three separate firing sequences with this particular taser:

      *   #44: an entry for 3/7/2008 at 11:50:49 p.m.

      *   #45: an entry for 3/8/2008 at 12:39:36 a.m.

      *   #46: an entry for 3/8/2008 at 12:39:45 a.m.

On the basis of the record in this case, I take it that each of these three entries would be called a

"clip."

      The officer or computer operator creating the CD accesses the recorded taser video data by

clicking *on entry #46 only*.  No further attention is paid to "firing data" #44 or #45.  For  undisclosed

reasons, on the CD the Marchand footage designated #46 is shown on a 3-inch by 3.5-inch window

taking up only a part of the computer screen, and the sound has been deleted.  The footage is choppy

and grainy and lasts about 2 minutes and 48 seconds.  From what one can see from it, Marchand is

going into the front door of his house, wearing only his pants or pajama bottoms.  He turns to speak.

Officer Simonson then rushes behind Marchand into the house and tasers him in the back.  The

footage then shows Marchand lying on his back on the floor.  When he gets up to walk away, distinct

taser burns are visible on his lower back.

      Defendants contend, seemingly without contradiction by Plaintiff's expert, that the contents

of *this particular clip, #46, standing alone*, could not be edited or changed in any way, while the

recorded data is still in the gun, or during the process of uploading (or downloading) that clip into

the taser camera library.  And, if one accepts Mr. Dembiczak's quoted statements that there were no

7

"multiple clips" but only "one clip on that date," then the controversy would be at an end: which is to say, the Defendants have produced everything there is to produce.  But what is one to make of "firing data" entries #44 and #45?  It seems clear that both of these entries were generated by the confrontation between Marchand and Simonson, which began during the night of March 7-March 8, 2008, while each individual was still in his vehicle, before the antagonists moved up the driveway and into Marchand's house, where the tasering took place.  It is likely that the earliest firing, noted on March 7 at 11:50:49 p.m. (entry #44), occurred during that run-up to the final confrontation and tasering which is recorded as #46 (the only one of the three firings printed on the CD and disclosed to Plaintiff).  The questions arise: Why does the CD tell us nothing about those two earlier entries?  And in the transfer from the gun camera to the taser camera library, or from the library to the CD, were those separate clips edited out and discarded, as apparently the technology would have allowed?

I stress that I do no more than point out the seeming existence of additional relevant questions; this Ruling does not undertake to give or suggest answers.  It may be that my relative lack of knowledge has led me astray, and these questions do not arise at all.  But I conclude for the present that those questions *do* arise, and in that circumstance make the following Order:

1.   Plaintiff is entitled to further discovery with respect to the questions discussed in this Ruling and any other questions related to the taser gun and the preservation of evidence generated by the gun camera during the incident in suit.  That discovery may consist of depositions pursuant to Rule 30, Fed. R. Civ. P.; interrogatories pursuant to Rule 33; requests for admission pursuant to Rule 36; and a visit to the Willimantic Police Department facilities in the manner described in Paragraph 2 of this Order.

2.      If Plaintiff desires to do so, Plaintiff is entitled to participate in a meeting with knowledgeable officials at the Willimantic Police Department facilities.   Plaintiff may be accompanied by his attorney and his expert witness (or Plaintiff may send those individuals to act on his behalf and not attend himself).  Counsel for Defendants may attend the meeting.  At the meeting, the Police Department officials must, in the presence of Plaintiff and/or his attorney and expert,  re-enact and re-create the process by which the previously disclosed CD was created from the taser camera library.   During this process, the video component should be shown on a full computer screen rather than in a smaller window, and the sound component should be included and audible rather than excluded.  Plaintiff's expert may submit questions about the process as it goes forward or after it is completed.  Those questions must be in writing.  The answers of the responsible officials must be in writing.  Counsel are directed to preserve the written questions and answers for possible use in the continuing litigation.  Plaintiff's expert is not allowed to ask questions orally.  He is not allowed to request the technical information referred to in earlier e-mail exchanges between counsel.  If such a meeting takes place, counsel for the parties are directed to inform the Court's Chambers of the date and time, so that the Court may deal on the telephone with any disputes or differences that may arise as the process goes forward (although that should not occur).

3.      Conceptually, there are two aspects of the litigation between these parties where the evidence previously disclosed or to be disclosed about the use of the taser gun and the preservation of its recordings may be relevant: a motion by Plaintiff for sanctions resulting from Defendants' spoliation of evidence; and use by Plaintiff for some purpose during the trial.[3]  If Plaintiff decides

---

[3]    I stress that this observation in text is conceptual only.  This Ruling neither expresses nor intimates any view by the Court as to whether a claim of spoliation of evidence would have merit, or whether the evidence in question would be admissible and probative at trial.

9

to rely upon and present to the trial court the opinions of his expert, Mr. Sanderson, or any other expert, Plaintiff must comply fully with the provisions of Rule 26(b)(4).

This case has been reassigned for all purposes including trial to United States District Judge Tucker L. Melançon.  The docket entries [Doc. 134] recite that Judge Melançon has set an amended date for jury selection of June 16, 2014 at 9:30 a.m., with jury trial to follow.  That date gives the parties ample time to complete whatever additional litigation steps that may be taken in the light of this Ruling.  All further applications by any party should be made to Judge Melançon, with the exception of any disputes that may arise during the implementation of Paragraph 2 of the Order set forth *supra*.  Judge Melançon's procedures and orders will govern the case as it goes forward.

Lastly, I will deal with Defendants' motion [Doc. 130] to preclude Plaintiff's expert, Sanderson, from testifying at the special hearing conducted by this Court on November 6, 2013, and at any trial; or, in the alternative, to be deposed under Rule 26.  Given the provisions of this Ruling, Plaintiff's motion to preclude or compel is DENIED AS MOOT with respect to Sanderson's testifying before or during the special hearing before this Court, which has now been concluded.  As for Plaintiff's motion to preclude Sanderson from testifying as a trial witness or to submit to discovery under Rule 26(b)(4) prior to trial, the motion is DENIED WITHOUT PREJUDICE to a later motion for that relief that Defendants may be advised to make to Judge Melançon as the trial judge.

All of the foregoing is SO ORDERED.

Dated:  New Haven, Connecticut
       December 30, 2013

                                          /s/ *Charles S. Haight, Jr.*
                                          Charles S. Haight, Jr.
                                          Senior United States District Judge