UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
------------------------------------------------------------- X
Gregg Marchand,

                          Plaintiff,          **RULING**

        -against-                Case No. 11-cv-348 (TLM)

Erik Simonson, City of Willimantic,
and Town of Windham,

                       Defendants
------------------------------------------------------------- X

      Before the Court are defendants', Erik Simonson ("Simonson"), the City of Willimantic

("Willimantic"), and the Town of Windham ("Windham") (collectively, the "defendants"),

Motion for Summary Judgment [Rec. Doc. 167],[1] requesting summary judgment on all of

plaintiff Gregg Marchand's ("Marchand" or the "plaintiff") claims, and plaintiff's opposition

thereto [Rec. Doc. 170]. For the reasons set forth below, defendants' Motion for Summary

Judgment will be granted in part and denied in part.

## I.    INTRODUCTION

      Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 against

defendants Willimantic police officer Simonson, Willimantic, and Windham[2] alleging that

defendants violated his federal constitutional rights. Plaintiff also alleges state law claims against

Simonson. Plaintiff originally appeared *pro se*, but has been represented by attorney John

Horvack since June 3, 2013. [Rec. Doc. 108]. The parties, in their Second Joint Submittal [Rec.

---

[1] The Court is in receipt of defendants' exhibits C and D, both of which are compact discs recordings that defendants provided to the Court pursuant to defendants' Notice of Manual Filing. [Rec. Doc. 168].

[2] Plaintiff's original complaint named the Willimantic Police Department ("Police Department") as a defendant. [Rec. Doc. 1]. On July 22, 2011, United States District Judge Charles S. Haight granted plaintiff leave to amend his complaint to substitute Windham for the Police Department. [Rec. Doc. 15]. On August 22, 2011, plaintiff filed his amended complaint [Rec. Doc. 23] naming Willimantic and Windham as defendants and removing the Police Department as a defendant. The record before the Court does not reveal why Windham is named as a municipal defendant. For purposes of this ruling, the Court has assumed that Willimantic and Windham each have a sufficient relationship with Officer Simonson or are otherwise involved with the circumstances of this case such that plaintiff may properly assert § 1983 claims against both.

Doc. 144] and in their summary judgment filings, dispute the nature of the claims brought by plaintiff in his amended complaint. Plaintiff asserts that he has brought a Fourth Amendment *Monell* claim based on an unconstitutional taser use policy against Willimantic and Windham and the following claims against Simonson in his individual and official capacity: (1) Fourth Amendment false imprisonment and false arrest; (2) Fourth Amendment warrantless entry; (3) state law trespassing; (4) Fourth Amendment excessive force; (5) Fourteenth Amendment substantive due process; and (6) state law harassment. [Rec. Doc. 144 at 3-4]. Defendants contend (1) that plaintiff has also, but improperly, brought claims against the Willimantic Police Department and Fifth Amendment claims against Simonson; (2) that plaintiff's *Monell* claim is not based on an unconstitutional taser use policy, but rather on an unconstitutional policy regarding false report writing; and (3) that plaintiff has not properly brought claims for Fourth Amendment warrantless entry or Fourteenth Amendment substantive due process. [*Id*. at 4-5].

## II.    BACKGROUND

### A.    Statement of Facts[3]

On March 8, 2008, plaintiff was driving toward the house where he resided with his mother and father at 36 Echo Drive in Willimantic Connecticut (the "house" or "property") when Simonson, a Willimantic Police Officer, began following him. [Rec. Doc. 170-1 ¶¶ 1-2, 48]. Marchand and Simonson had no contact with each other before March 8, 2008. [Rec. Doc. 170-1 ¶ 4]. While following him, Simonson ran Marchand's vehicle registration and was told by dispatch that the vehicle was registered to Marchand, with a P.O. box address in North Windham. [Rec. Doc. 167-4 ¶¶ 9-10]. Marchand subsequently turned onto Echo Drive, pulled over to the left-hand side of the road, and turned off his headlights. [Rec. Doc. 170-1 ¶ 10]. As

---

[3] For the purposes of this ruling, the Court has accepted the undisputed facts in the parties' Local Rule 56(a) Statements [Rec. Doc. 167-2 and 170-1] and viewed the disputed facts in the light most favorable to plaintiff, the non-moving party.

Simonson drove by Marchand he shined his cruiser spotlight on Marchand's vehicle for approximately one second, then continued to drive down the street past Marchand. [*Id.* ¶ 11]. After Simonson passed, Marchand began to honk his horn and flash his lights in what both parties agree was an attempt to get Simonson's attention. [*Id.* ¶ 12]. Simonson turned his vehicle around and drove back toward Marchand. [*Id.* ¶ 13]. Marchand, who had since parked his vehicle on the right-hand side of the road in front of the house and exited, gestured for Simonson to stop. [*Id.* ¶¶ 13-14; Rec. Doc. 170-2 ¶ 13]. Simonson stopped, at which time Marchand approached Simonson's vehicle and asked him why he had shined a light in his face. [Rec. Doc. 170-2 ¶¶ 15-16]. Simonson did not respond. [Rec. Doc. 170-1 ¶ 17].

Marchand began walking down the driveway of the house; at the time, Simonson did not know who lived in the house. [*Id.* ¶¶ 17-18]. Simonson then exited his vehicle and asked Marchand what street they were on. [Rec. Docs. 170-1 ¶ 19; 170-2 ¶ 18]. Marchand answered and then asked Simonson, "why the fuck did you put the spotlight in my face?" [Rec. Docs. 170-1 ¶ 19; 170-2 ¶ 19]. Simonson responded to Marchand to "get the fuck off this property." [Rec. Doc. 170-2 ¶ 20]. Marchand continued to walk down the driveway [Rec. Doc. 170-2 ¶ 21]. Twice more, Simonson told Marchand to get off the property as Marchand continued to walk down the driveway. [Rec. Doc. 170-1 ¶¶ 22-24].

Simonson followed Marchand onto the property and, as Marchand was beginning to ascend a set of cement stairs leading to a screen door on the side of the house, pulled Marchand to the ground, forcing Marchand to his hands and knees and applying pressure to his shoulder area; the parties dispute the amount of force used to pull Marchand to the ground. [Rec. Docs. 167-2 ¶¶ 26-27; 170-1 ¶¶ 26-27]. Marchand pulled away from Simonson and ran approximately three feet toward and up the cement staircase. [Rec. Doc. 170-1 ¶ 28]. As Marchand reached the

top stair, Simonson grabbed Marchand's left arm; Marchand struggled and caused Simonson to lose his grip, although Simonson managed to pull off Marchand's sweatshirt. [*Id.* ¶¶ 29-30]. Marchand then opened the screen door and began to pound on the side door of the house, yelling, "Mom, Mom, open the door." [Rec. Docs. 170-1 ¶ 31; 170-2 ¶ 32]. Lillian Marchand ("Ms. Marchand"), Marchand's mother, opened the door, at which point Simonson said: "don't go in the house, Ma'am don't open the door." [Rec. Docs. 170-1 ¶ 32; 170-2 ¶ 33]. Simonson told Marchand not to go inside the house or Simonson would use his taser on Marchand.[4] [Rec. Docs. 170-1 ¶¶ 33-34; 170-2 ¶ 34]. Simonson then tased Marchand, at which point Marchand fell on the floor inside the house. [Rec. Doc. 170-1 ¶ 35]. As Marchand began to get up, Simonson told him "either, [g]et down, or, [g]et on the ground." [Simonson Dep., 164:17-19, Aug. 8, 2013, Rec. Doc. 170-3; *see also* Rec. Docs. 167-2 ¶ 36; 170-1 ¶ 36]. At the same time Simonson was telling plaintiff to "get down" or "get on the ground," he also gave what plaintiff contends was a contradictory instruction to "get over here." [Simonson Dep., 164:13-19, Aug. 8, 2013, Rec. Doc. 170-3; *see also* Rec. Doc. 170-1 ¶ 36]. Simonson admits he said this to someone, but testified in his deposition that he does not know whether the command was directed at Marchand or Ms. Marchand. [Simonson Dep., 164:13-19, Aug. 8, 2013, Rec. Doc. 170-3 ("I'm not sure who the [g]et over here was meant for.")]. Simonson then tased Marchand a second time. [Rec. Doc. 170-1 ¶ 37]. Marchand asserts that at some point during the encounter, Simonson entered the house. [Rec. Doc. 170-1 ¶ 93]. Simonson does not remember if he entered the house, but testified in his deposition that he may have done so. [Simonson Dep., 166:9-20, 183:19-24, Aug. 8, 2013, Rec. Doc. 170-3].

---

[4] Marchand asserts that he did not know what a "taser" was before Simonson deployed it. [Rec. Doc. 170-2 ¶ 34].

After the arrival of back-up, a canine team, Marchand exited the house and was arrested for interfering with a police officer in violation of C.G.S. § 53a-167a. [Rec. Doc. 170-1 ¶ 38]. Judge Oliver Danielson in the State of Connecticut Superior Court made a probable cause finding on February 25, 2010, but the prosecutor subsequently declined to prosecute the case against plaintiff by entering a *nolle prosequi* on the charge on March 22, 2011. [Rec. Doc. 167-7; Rec. Doc. 170-1 ¶ 39].

**B.     Relevant Procedural Background**

This case was originally assigned to United States District Judge Charles S. Haight. The case was reassigned to the undersigned on December 7, 2012, [Rec. Doc. 84], although Judge Haight continued to hear and decide motions and conduct hearings related to a pending evidentiary dispute that was resolved on December 30, 2013, [Rec. Doc. 147].

On November 29, 2012, defendants filed a Motion for Summary Judgment. [Rec. Doc. 81]. Plaintiff was appearing *pro se* at that time; his attorney, John Horvack, was not appointed to represent plaintiff in this proceeding until June 3, 2013. [Rec. Doc. 108]. On October 25, 2013, plaintiff's attorney filed an opposition to defendants' Motion for Summary Judgment [Rec. Doc. 138] and on November 1, 2013, Judge Haight stayed all further briefing on defendants' Motion pending the outcome of the then-ongoing evidentiary dispute [Rec. Doc. 141]. After the evidentiary dispute was resolved by Judge Haight on December 30, 2013, [Rec. Doc. 147], both parties requested leave to make additional filings related to defendants' Motion. [*See* Rec. Doc. 156]. In light of the parties' requests, the Court ordered the defendants to withdraw their then-pending Motion for Summary Judgment [Rec. Doc. 81], ordered plaintiff to withdraw his opposition to defendants' motion [Rec. Doc. 138], and issued a Scheduling Order [Rec. Doc. 156] for the re-filing and briefing of defendants' motion for summary judgment and plaintiff's

opposition. Defendants' November 20, 2012 Motion and plaintiff's October 25, 2013 Opposition were thereafter withdrawn. [Rec. Docs. 166, 169, and 180]. Thus, the only filings pending before the Court are defendants' Motion for Summary Judgment, filed on January 24, 2014, [Rec. Doc. 167], and plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed on January 31, 2014, [Rec. Doc. 170].

## III.    STANDARD OF REVIEW

Summary judgment is appropriate only when the record reflects that "there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering a motion for summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Id.* In making this determination, the trial court "may not make credibility determinations or weigh the evidence." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (internal citations and quotation marks omitted). Rather, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Loeffler v. Staten Island Univ. Hosp.* 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009). In situations where "the non-movant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healy Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir. 1999). Once the moving party has satisfied its burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that

there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (stating that a non-moving party must point to more than the "'mere existence of a scintilla of evidence'" in order to defeat a motion for summary judgment (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986))). In order to establish that there is a genuine issue of fact to be resolved at trial, the non-moving party must present more than mere allegations or denials of the adverse party's pleadings; affidavits or other admissible evidence must be presented to show that there are genuine issues of material fact. *Anderson*, 477 U.S. at 248-49; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970); *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If there is no issue of material fact to be resolved at trial and the movant is entitled to judgment as a matter of law, the court is required to render the judgment as prayed for. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citations and internal quotation marks omitted). "A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Application of the liberal *pro se* standard is particularly important in cases in which the plaintiff

alleges a violation of his civil rights. *See Sealed Plaintiff v. Sealed Defendant # 1*, 537 F.3d 185,

191 (2d Cir. 2008) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). As

Plaintiff's attorney, after his appointment to represent plaintiff on June 3, 2013 [Rec. Doc. 108],

filed an opposition to defendant's motion for summary judgment on plaintiff's behalf, the Court

need not apply the liberal *pro se* construction in considering plaintiff's opposition. However, the

Court has taken into consideration plaintiff's *pro se* status at the time he filed his amended

complaint [Rec. Doc. 23] in construing that filing. *See Tibbetts v. Stempel*, 354 F. Supp. 2d 137,

144 n.14 (D. Conn. 2005) (taking into account period of representation and non-representation in

applying the general liberal *pro se* construction standard).

## IV.    DISCUSSION

### A.    Claims Against Municipal Defendants

#### i.    Whether Plaintiff has Brought Claims Against the Proper Defendants

Defendants assert that "[c]laim 8 of the plaintiff's amended complaint pleads a claim

against the Willimantic Police Department," but that any such claim "fails as a matter of law, as

a Police Department is not a legal entity with the legal capacity to sue and be sued." [Rec. Doc.

167-1 at 3]. Plaintiff argues that his Amended Complaint [Rec. Doc. 23] should be construed

using the liberal *pro se* construction standard, as plaintiff filed it while he was not represented by

counsel, and that it "is fairly read to name the Town of Windham as the Defendant." [Rec. Doc.

170 at 7]. The Court agrees with plaintiff and has applied a liberal construction to plaintiff's

amended complaint as it was filed while he was appearing *pro se*.

Prior to plaintiff filing his amended complaint on August 22, 2011, [Rec. Doc. 23], he filed a Motion to Amend Service of Defendant on July 18, 2011, [Rec. Doc. 11], in which he stated "I found that police departments cannot be defendants, it is the town in which the department is in will be liable." [Rec. Doc. 11]. Judge Haight construed this motion as a motion to amend the complaint and granted plaintiff leave to amend his complaint to "substitute the Town of Windham for the Willimantic Police Department." [Rec. Doc. 15]. Although count eight of plaintiff's amended complaint describes the actions of the Willimantic Police Department (the "Police Department"), he lists Willimantic and Windham, not the Police Department, as defendants in the caption on the front page of the filing. [Rec. Doc. 23]. The Court therefore finds that, applying the liberal *pro se* construction standard to plaintiff's amended complaint, plaintiff has properly substituted the City of Willimantic and the Town of Windham (collectively, the "Municipal Defendants") for the Police Department. Thus, the Court will deny as moot defendants' Motion on plaintiff's claims against the Police Department, as the Police Department is no longer a defendant in this case,[5] and will deny defendants' Motion on plaintiff's claims against the Municipal Defendants insofar as it alleges that plaintiff has not substituted Willimantic and Windham as party defendants.

**ii.**      **Whether Plaintiff has Properly Brought *Monell* Claims Against the Municipal Defendants**

In order to state a *Monell* claim for relief under 42 U.S.C. § 1983 against a municipal defendant, a plaintiff must allege the existence of an official policy or custom and a direct causal

---

[5] Although plaintiff acknowledges the substitution of defendants, and the docket sheet clearly reflects that the Police Department was terminated as a defendant on August 22, 2011, plaintiff asserts in his opposition to summary judgment that the Police Department has "waived the issue of capacity to be sued." [Rec. Doc. 170 at 8]. Having found that the Police Department was terminated as a defendant in the case based on plaintiff's own motion, the Court need not address whether the Police Department waived its capacity to be sued, but does note that § 1983 claims against a police department fail as a matter of law as police departments in Connecticut are not separate legal entities with the capacity to sue or be sued. *See Rose v. City of Waterbury*, 3:12cv291(VLB), 2013 WL 1187049, at *9 (D. Conn. Mar. 21, 2013).

link between that policy or custom and his alleged deprivation of constitutional rights. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Defendants' Motion for Summary Judgment addresses three possible grounds for plaintiff's *Monell* claim against the Municipal Defendants: (1) the municipality adopted an unconstitutional taser use policy; (2) the municipality failed to adequately train its officers; and (3) the municipality failed to adequately supervise or discipline Simonson as it relates to taser use, improper arrests, or false report writing. [Rec. Doc. 167-1 at 36-40].

In the parties' Second Joint Submittal in which the "attorneys [were] to list every remaining claim that is to be tried," pursuant to the Court's Jury Trial Procedure Order [Rec. Doc. 126 at 2], plaintiff lists only one *Monell* claim, for an "unconstitutional taser use policy," the first ground addressed by defendants. [Rec. Doc. 144 at 3]. The Court's Jury Trial Procedure Order instructed the parties that "[a]ny claim not listed in the second joint submittal will be deemed abandoned by the Court." [Rec. Doc. 126 at 2]. Additionally, plaintiff's opposition to defendants' motion contains no counter-argument related to the second or third potential *Monell* claims as set out by defendants. [*See* Rec. Doc. 170 at 36-40]. "Federal Rule of Civil Procedure 56 provides that if a non-moving party fails to oppose a summary judgment motion, then 'summary judgment, *if appropriate*, shall be entered against' him." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). As plaintiff has not made any argument nor presented a *soupçon* of competent summary judgment evidence suggesting a triable issue as to the second or third potential grounds for a *Monell* claim and has abandoned those claims by failing to list them in the second submittal, the Court will grant defendants' Motion on plaintiff's *Monell* claim for failure to train and for failure to supervise or discipline, to the extent *Monell* claims on those theories were ever asserted.

Regarding the *Monell* claim for unconstitutional taser use policy, defendants argue that plaintiff did not plead such a claim in his amended complaint, but rather "attempts to transform the *Monell* claim based upon false report writing into a *Monell* claim based upon an unconstitutional Taser policy." [Rec. Doc. 167-1 at 2]. Plaintiff responds that the Court should construe plaintiff's *pro se* amended complaint liberally to allege such a claim. [Rec. Doc. 170 at 36]. In support of this argument, plaintiff states: (1) "[t]he municipal defendants were . . . put on notice from the Complaint itself that Marchand sought to impose *Monell*-type liability on them for any of Simonson's constitutional violations"; (2) Count VIII of the amended complaint states some type of *Monell* claim against the Municipal Defendants; and (3) there is no prejudice to the defendants by allowing this claim to go forward because "[t]he [taser use] policy has been the subject of questioning in the depositions . . . putting the municipal Defendants on notice of this specific claim." [*Id*. at 36-37].

Initially, the Court notes that plaintiff's counsel does not point to any section of the amended complaint which could possibly be construed to raise a *Monell* claim based on an unconstitutional taser use policy, or any section of the amended complaint that mentions taser use policy at all, either in the claims asserted against Simonson or against the Municipal Defendants. Additionally, plaintiff's counsel provides no support for the proposition that, having pled one *Monell* claim in his amended complaint, he successfully put the defendants on notice of any number of other *Monell* claims he might subsequently wish to bring. A municipality is likely to have numerous policies in place at any given time and a claim based on one policy does not, without some factual connection or legal justification, translate into a claim based on another, wholly different, policy. Similarly, plaintiff provides no support for the proposition that simply because an issue "has been the subject of questioning in . . . depositions," the opposing party is

put on notice of an unasserted claim, or that such questioning in depositions is sufficient to amend the complaint to state a new claim.[6]

Although a court is "obligated to draw the most favorable inferences that [a *pro se* plaintiff's] complaint supports, [it] cannot invent factual allegations that he has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Construing plaintiff's amended complaint liberally, he does not state a *Monell* claim based on the municipality's allegedly unconstitutional taser use policy. He does not allege the existence of an official policy related to taser use, or how such a policy was related to his alleged deprivation of constitutional rights. As this claim was never pled, defendants' Motion on plaintiff's attempted *Monell* claim based on the Municipal Defendants' allegedly unconstitutional taser use policy will be granted.

The judgment that the Court will enter will thus grant defendants' Motion on all of plaintiff's *Monell* claims against the Municipal Defendants.

## B.    Fourth Amendment False Arrest[7]

Defendants argue that plaintiff cannot prevail on his false arrest claim because his arrest was supported by probable cause. [Rec. Doc. 167-1 at 15-20]. In support of this argument, defendants assert that probable cause has already been established because a Connecticut state court judge made a finding of probable cause before a *nolle prosequi* was entered by the prosecutor, terminating the related criminal case against plaintiff, and that Simonson had probable cause to arrest plaintiff for three criminal violations: parking on the left-hand side of the road, trespass, and interfering with an officer. [*Id.*] In the alternative, defendants assert that Simonson is entitled to qualified immunity as a matter of law. [*Id.* at 20].

---

[6] Contrary to plaintiff's counsel's argument that a party is put on notice of a claim because the topic underlying the claim is discussed during a deposition, depositions may delve into a wide variety of topics that are not necessarily relevant to the claims at issue. Federal Rule of Civil Procedure 30, which governs depositions by oral examination, states that, with few exceptions, deposition "testimony is taken subject to any objection," thereby allowing a deposing attorney to go into potentially irrelevant subjects during the deposition. Fed. R. Civ. P. 30(c)(2).

[7] The parties refer to this claim as "false arrest" and "false arrest/false imprisonment."

###### i.       Whether There Was Probable Cause to Arrest Plaintiff

In order to establish a § 1983 false arrest claim based on the Fourth Amendment right to be free from unreasonable seizures, a plaintiff must show: "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent for the arrest; and (4) the arrest was not supported by probable cause." *Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002) (citing *Arum v. Miller*, 193 F. Supp. 2d 572, 585 (E.D.N.Y. 2002)). The existence of probable cause for an arrest "is a complete defense to an action for false arrest." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Kent v. Katz*, 312 F.3d 568, 573 (2d Cir. 2002) (stating that a false arrest claim "may not be maintained if there was probable cause for the arrest").

Federal and Connecticut law both provide that probable cause for an arrest exists when an officer has "'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)); *see also Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007). In assessing whether an officer had probable cause for an arrest, a court must look at the "totality of the circumstances." *Bernard,* 25 F.3d at 102 (citing *Gates*, 462 U.S. at 230). "Review for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013). Probable cause may be determined "as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

1.      **Whether the Connecticut State Court's Probable Cause Determination Precludes Further Determination of Probable Cause**

Defendants argue that because a Connecticut state criminal court made a finding of probable cause prior to a *nolle prosequi* being entered in the case arising from the arrest at issue, "any claims of false arrest and false imprisonment fail as a matter of law." [Rec. Doc. 167-1 at 20]. "[A] federal court must give to a state-court judgment the same preclusive effect as would be given the judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In Connecticut, "[c]ollateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action." *Mulligan v. Rioux*, 229 Conn. 716, 752 (Conn. 1994) (citations and internal quotation marks omitted). However, "[c]ollateral estoppel [does] not preclude [a] plaintiff from litigating the existence of probable cause even though that issue ha[s] already been partially litigated" in a state court probable cause hearing because of "procedural limitations" inherent to the state court's probable cause hearing that do not apply in a civil trial. *Id*. Thus, the Connecticut state criminal court's determination of probable cause during a probable cause hearing does not preclude relitigation of the issue of probable cause for the arrest in plaintiff's § 1983 civil case.

2.      **Whether Simonson Had Probable Cause to Arrest Marchand**

Defendants argue that Simonson had probable cause to arrest Marchand for (1) violation of C.G.S. § 14-251, for parking on the left-hand side of the road; (2) violation of C.G.S. § 53a-110a, for simple trespass; or (3) violation of C.G.S. § 53a-167a, for interfering with an officer. [Rec. Doc. 167-1 at 15-20]. Marchand was actually arrested for violation of C.G.S. § 53a-167a, interfering with an officer. As "the subjective reason for making the arrest need not be the criminal offense as to which the known facts provide[d] probable cause," defendants are entitled

14

to summary judgment if the undisputed facts show that Simonson had probable cause to arrest Marchand for any alleged criminal offense. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

As to whether Simonson had probable cause to arrest Marchand for a violation of C.G.S. § 14-251, for parking on the left-hand side of the road, defendants argue that pursuant to *Atwater v. City of Lago Vista*, an officer can perform a custodial arrest for even a minor traffic violation such as parking on the left-hand side of the road. [Rec. Doc. 167-1 at 16 (citing 532 U.S. 318, 348 (2001)]. However, *Atwater* dealt with a misdemeanor violation, for which custodial arrest was authorized or permitted in the state of Texas, where the arrest occurred. *See Atwater*, 532 U.S. at 323. Because "a police officer's defenses to a § 1983 action are no greater than those available to him under pertinent state law," the Court looks to whether Connecticut law authorized or permitted custodial arrest for parking on the left-hand side of the road. *Thamel v. Town of E. Hartford*, 373 F. Supp. 455, 457-58 (D. Conn. 1974). Here, plaintiff argues that the crime Marchand allegedly committed is only a motor vehicle "infraction," for which Connecticut does not permit arrest. Conn. Practice Series § 44-23 (an individual "charged with an infraction involving a motor vehicle . . . shall not be taken into custody"); *See* C.G.S. § 14-251 ("Violation of any provision of this section shall be an infraction."). Thus, assuming *arguendo* that Marchand violated the statute by parking on the left-hand side of the road, [8] the Court must find that Simonson did not have probable cause to arrest Marchand for a violation of C.G.S. § 14-251 as custodial arrest for this infraction is not permitted under Connecticut law.

---

[8] Plaintiff also argues that he did not violate C.G.S. § 14-251 because he merely pulled over to the left-hand shoulder of the road. [Rec. Doc. 170 at 11-13]. As the Court finds that Simonson did not have probable cause to arrest Marchand for violation of this statute, there is no need for the Court to address plaintiff's argument that he did not violate the statute.

As to trespass,[9] defendants assert that Simonson had probable cause to arrest Marchand because Simonson did not know who lived at the property, Marchand's vehicle registration did not indicate the property's address, Marchand never told Simonson that he lived at the property, and Marchand "ignored [Simonson's] multiple commands to get off the property." [Rec. Doc. 167-1 at 19]. Plaintiff asserts that he was yelling "Mom, Mom, open the door," at the door of the house, in response to which a woman opened the door. [Rec. Doc. 170-2 ¶¶ 32-33]. Simonson testified in his deposition that he believed Ms. Marchand "was opening the door to see who was acting crazy banging at her door." [Simonson Dep., 92:16-18, Aug. 8, 2013, Rec. Doc. 167-14]. Viewing the evidence, including a video of part of the incident [Rec. Doc. 167-6], in the light most favorable to the plaintiff, a reasonable jury could conclude that the woman who opened the door indicated that she heard and/or recognized her son and was concerned by Simonson's presence and actions. This is a credibility and fact determination that must be left to a jury.

In response to defendants' statement that Marchand never told Simonson where he lived, plaintiff argues that Simonson never asked Marchand where he lived [Rec. Doc. 170 at 15-16]. Defendants' argument that "after each of the commands to get off the property Marchand never responded that he lived here," implies that Marchand should have somehow construed Simonson's "commands" as questions. Words, which mean one thing on paper, may take on different meanings in their spoken form and must be viewed and often interpreted in light of the circumstances in which they were spoken, including the speaker's tone, demeanor, and gestures as well as the context of the conversation as a whole. Based on the undisputed facts in the record before the Court, there is a question of fact as to the meaning and overall context of Simonson's

---

[9] C.G.S. § 53a-110a provides that "[a] person is guilty of simple trespass when, knowing that he is not licensed or privileged to do so, he enters any premises without intent to harm any property."

commands and Marchand's failure to respond to those commands. This is a question of fact that must be resolved by a jury.

In reaching its conclusion, the Court has considered the totality of the facts, both inculpatory and exculpatory, based on the record, that could have been known to Simonson at the time of Marchand's arrest and finds that there are genuine issues of material fact as to whether Simonson had probable cause to arrest Marchand for trespass.

As to interfering with an officer, defendants argue that Simonson had probable cause to arrest Marchand because he "interfered by failing to comply with the officer's multiple orders" to get off the property, "physically struggle[d] with, and evad[ed] the officer" twice, and "interfered by failing to comply with the officer's multiple orders" to get on the ground. [Rec. Doc. 167-1 at 18-19]. "Interfering with an officer" is committed when an individual "obstructs, resists or endangers . . . any peace officer . . . in the performance of such peace officer's . . . duties." C.G.S. § 53a-167a. In order to commit the crime of interfering with an officer, the officer must have been "acting 'in the performance of his official duties.'"[10] *State v. Davis*, 261 Conn. 553, 566 (Conn. Sup. Ct. 2002). Defendants characterize Simonson's actions while he was commanding Marchand to get off the property, attempting to physically restrain him, and ordering him to the ground as an attempted *Terry* stop,[11] which if true would be an activity

---

[10] The issue of whether Simonson was engaged in the performance of his official duties is separate from the § 1983 requirement that a defendant be "acting under the color of state law." The "relationship of [the involved] conduct to the performance of the officer's official duties" is only one of several factors considered in determining whether an officer was acting under color of state law. *Banisaied v. Clisham*, 992 F. Supp. 128, 130 (D. Conn. 1998).

[11] Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may "briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.'" *United States v. Padilla*, 548 F.3d 179. 186 (2d Cir. 2008) (citing *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). A *Terry* stop is not consummated until the targeted individual stops, where "a reasonable person would have believed that he was not free to leave," or is otherwise seized by the officer. *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009) (internal quotation marks and citations omitted). Defendants argue that "at no time did Mr. Marchand 'stop,'" which plaintiff does not dispute. [Rec. Doc. 167-1 at 8 n.1]. The Court has analyzed Simonson's actions leading up to Marchand's arrest as a possible "attempted *Terry* stop," as it is unclear from the record at what point, or even if, Marchand was 'briefly detained' prior to his arrest. Assuming Simonson was

undertaken in the course of Simonson's official duties. [Rec. Doc. 167-1 at 13]; *see State v. Aloi* (officer was acting in performance of official duties when conducting a *Terry* stop). Plaintiff does not dispute that he ignored Simonson's commands to get off the property and physically struggled to get away from Simonson,[12] but does dispute whether Simonson's conduct during the time period in question was undertaken as part of a lawful attempt at a *Terry* stop. [Rec. Doc. 170 at 16]. The Court must determine whether Simonson was actually engaged in the performance of his official duties at the time Marchand refused his commands and physically evaded him before it can resolve the issue of whether probable cause existed for Simonson to arrest Marchand for interfering with an officer; if Simonson was not performing his official duties, Marchand's decision to ignore his commands and attempts at physical restraint could not have given rise to probable cause for arrest for interfering with an officer.[13]

Based on the record currently before the Court, there are material issues of fact as to whether Simonson was attempting a *Terry* stop during the time period in which Marchand ignored his commands and physically evaded him. Viewing the facts in the light most favorable to the plaintiff, Marchand initially flagged down Simonson's car, as opposed to Simonson stopping Marchand; Marchand approached Simonson's car and asked him a question, which

---

initially attempting a *Terry* stop, it is unclear at what point Simonson's attempts to detain Marchand transformed from an attempted *Terry* stop to an attempted arrest. The Court does not find it necessary to speculate as to whether Simonson's acts of grabbing Marchand and tasing him were *Terry* stops or attempted arrests. As the question the Court faces is only whether Simonson was engaged in the performance of his official duties, it does not matter whether Simonson's actions are analyzed as an attempted *Terry* stop or a completed *Terry* stop.

[12] Plaintiff does dispute that he ignored Simonson's command to "get on the ground," prior to being tased, stating that he "only recalls being told not to go into his home." [Rec. Doc. 170-1 ¶33]. This factual dispute is immaterial as *any* interference with Simonson's performance of his official duties would have created probable cause for arrest. Marchand has agreed that he ignored Simonson's commands to get off the property and that he physically struggled to get away from Simonson. The only question of fact remaining is whether Simonson was engaged in the performance of his official duties.

[13] The Court has not foreclosed the possibility that Simonson could have approached Marchand during this time period for some other proper reason, also in the course of Simonson's official duties. However, as no other explanation as to Simonson's "official duties" at the time of the incident has been proposed by defendant or suggested by the record, the Court at this juncture can only evaluate whether Simonson was engaged in his official duties by attempting to conduct a *Terry* stop.

Simonson did not answer; and it was only at this point that Marchand proceeded toward the house and Simonson began ordering him to get off the property. In his deposition, Simonson stated that he decided to order Marchand off the property because "[t]here is a million possibilities, all terrible, going through my mind as he is running towards the house." [Simonson Dep., 61:17-19, Aug. 8, 2013, Rec. Doc. 167-14]. Marchand has stated that he merely "walk[ed] back to [the] house" and that it was Simonson who "jogged," [Marchand Dep., 79:25-80:5, July 11, 2012, Rec. Doc. 167-3]. A careful scrutiny of the record reveals that the parties characterize this interaction very differently. Defendants portray Marchand's behavior as "evasive" and describe Simonson's response as that of a concerned police officer trying to investigate possible criminal activity. [Rec. Doc. 167-1 at 14]. Marchand, on the other hand, portrays himself as a concerned citizen fearful for his safety and Simonson as threatening him without justification. [*See* Rec. Doc. 170 at 3]. As discussed above, while defendants construe Simonson's "commands" as questions to which Marchand should have provided responses about where he lived, plaintiff construes these "commands" as unlawful attempts to order him from his or his parents' property, with no investigative purpose. Based on the dispute as to the facts that set up the encounter on the property between Marchand and Simonson, there are material issues of fact as to whether the hallmark of a *Terry* stop, some attempted investigation of suspected criminal activity, existed. Construing the facts in the light most favorable to the plaintiff, a reasonable jury could conclude that Simonson was not acting in the performance of his official duties and thus Marchand's refusal to comply with his commands and attempts at physical restraint did not give rise to probable cause for arrest for interfering with an officer.

Therefore, defendants' Motion on plaintiff's false arrest claim will be denied insofar as it is based on there being actual probable cause to arrest Marchand.

ii.   **Whether Simonson is Entitled Qualified Immunity on Plaintiff's False Arrest Claim**

In the alternative, defendants argue that even if Marchand's arrest is unsupported by probable cause, qualified immunity protects Simonson from plaintiff's false arrest claim.

Although it is well established that individuals have a constitutional "right to be free from arrest or prosecution in the absence of probable cause," qualified immunity will shield a police officer from a claim for damages arising from a false arrest if "(1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was probable cause to arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). The Second Circuit has said that a police officer receives the protection of qualified immunity if there was "arguable probable cause," which "exists when a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (internal brackets omitted); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (stating that "if police officers of reasonable competence could disagree as to whether there was probable cause, there is 'arguable' probable cause sufficient to warrant qualified immunity"). "[A]t its heart, the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in those situations courts will not hold that they have violated the Constitution." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (internal quotation marks and citations omitted) (second alteration in original). "Though in retrospect it [may be] apparent that [a] seizure lacked probable cause, the officer[] [may be] entitled to qualified immunity. Qualified

immunity is designed to protect officers making 'split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving.'" *Palmer v. New Britain Gen. Hosp.*, No. 3:05-CV-943(RNC), at *4 (D. Conn. Feb. 13, 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

"Even on summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of the seizure." *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001). Police officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir. 2000) (internal citations and quotation marks omitted). A "court *must* grant police officers qualified immunity when the court concludes that the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality of the seizure." *Cerrone*, 246 F.3d at 203 (emphasis added).

The undisputed facts in this case include Simonson's lack of knowledge as to who lived at the property, Marchand's vehicle registration to an address other than the address of the property, Marchand's refusal to get off the property at Simonson's command, Marchand walking away from Simonson after flagging down his vehicle, Marchand's physical resistance to Simonson's attempt to detain him, and Marchand knocking on the door and yelling something rather than producing a key.

Although Simonson did not "explore and eliminate every theoretically plausible claim of innocence," such as the possibility that the woman who answered the door was indeed Marchand's mother or that Marchand's vehicle registration did not return the address of his

residence, he was not required to do this before making an arrest. *Martinez*, 202 F.3d at 635. As to whether Simonson had "arguable probable cause" based on Marchand's actions in response to the alleged attempted *Terry* stop, the Court must determine whether a reasonable officer in the same situation would have believed that he was engaged in official duties, here an attempted *Terry* stop. The Court finds that reasonable officers could disagree as to whether Simonson's actions of following Marchand and ordering him off the property constituted an attempted *Terry* stop and thus whether Simonson was engaged in the performance of his official duties. *See United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (finding that the "police officer's order to stop" constituted the initiation of a *Terry* stop).

As previously set out, the undisputed facts did not provide probable cause to arrest plaintiff for any of the three violations for which defendants maintain Simonson had probable cause to arrest Marchand. However, the Court concludes that these same undisputed facts did provide Simonson with "arguable probable cause" to arrest plaintiff for either trespass or interfering with an officer[14] as "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Droz*, 580 F.3d at 109.

As a reasonable officer confronted with the situation Simonson encountered and possessing the same information he did could have believed there was probable cause to arrest Marchand for trespass or interfering with an officer, and at a minimum, reasonable officers could disagree as to whether there was probable cause for such an arrest, the Court finds that Simonson is entitled to qualified immunity on plaintiff's false arrest claim and will therefore grant defendants' Motion on plaintiff's false arrest claim.

[14] The Court need not, and does not, find that arguable probable cause existed to arrest Marchand for committing a motor vehicle infraction. As discussed above, Connecticut law clearly states that an officer may not perform a custodial arrest for such an infraction.

**C.      Fourth Amendment Illegal Entry and State Law Trespass**

Defendants argue that (1) plaintiff has asserted a state law trespass claim only and that it cannot be converted into a Fourth Amendment illegal entry claim; (2) Simonson did not enter an area in which Marchand had a reasonable expectation of privacy; (3) even if Simonson did enter private property, his entry was justified by probable cause and exigent circumstances; (4) even if Simonson entered private property without probable cause and exigent circumstances, he is entitled to qualified immunity as a matter of law; and (4) plaintiff's state law trespass claim fails as Simonson was a licensee at all times.

Plaintiff argues that his Amended Complaint [Rec. Doc. 23] should be construed using the liberal *pro se* construction standard as plaintiff filed it while he was not represented by counsel and that, liberally construed, it states a claim for both common law trespass under Connecticut state law and Fourth Amendment illegal entry. [Rec. Doc. 170 at 29]. Upon review of the amended complaint, and in consideration of plaintiff's *pro se* status at the time he filed it, the Court concurs and will address both claims.

> **i.      Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Fourth Amendment Illegal Entry Claim**

> **1.      Whether Simonson Entered an Area in Which Marchand had a Reasonable Expectation of Privacy**

In order for Fourth Amendment protections against unreasonable searches and seizures to apply, a plaintiff must show that the area in question is one in which the plaintiff enjoys a "reasonable expectation of privacy." *See United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996). Defendants argue that "[t]he altercation between Officer Simonson and Mr. Marchand occurred up the driveway and onto the stoop/steps just outside of the side door of 36 Echo

Drive," an area which the defendants state is not curtilage[15] and therefore not an area in which Marchand had a reasonable expectation of privacy. [Rec. Doc. 167-1 at 22]. Whether or not plaintiff has a reasonable expectation of privacy in the areas surrounding his house is irrelevant for the purposes of the present ruling as, based on Simonson's deposition alone, there is a question of fact as to whether Simonson entered the house itself. [Simonson Dep., 166:9-20, Aug. 8, 2013, Rec. Doc. 170-3 (stating that he does not know whether he was in the house, in the doorway, or on the outside of the doorway during the second tasing)]. It is undisputed that "[w]arrantless entry into a home is *per se* unreasonable." *Waananen v. Barry*, 343 F. Supp. 2d 161, 167 (D. Conn. 2004); *see also Kyllo v. United States*, 533 U.S. 27, 37 (stating that "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much" (citation omitted)). Thus, assuming the facts in the light most favorable to the plaintiff, the Court assumes that Simonson entered the house, an area in which plaintiff clearly had a reasonable expectation of privacy.[16]

### 2. Whether Probable Cause and Exigent Circumstances Existed to Justify Simonson's Warrantless Entry

It is a "firmly established rule that 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'" *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002) (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam)). It is undisputed that Simonson did not have a warrant to arrest Marchand at the time of the incident in question. As set out above, there is at a minimum a question of fact as to whether Simonson had probable cause to arrest Marchand. *See* Section IV(B)(i)(2). Because this material

---

[15] "[C]urtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home." *California v. Ciraolo*, 476 U.S. 207, 213 (1986).
[16] Defendants' argument that Simonson is entitled to qualified immunity because a reasonable officer would not have believed that the area he entered was curtilage is moot, as it focuses solely on the area surrounding the house, and does not address the question of fact as to whether Simonson entered the house itself.

question of fact prevents the Court from resolving, on summary judgment, whether Simonson's entry into the house was constitutionally permissible, the Court need not reach the question of whether the undisputed facts establish the existence of exigent circumstances.

### 3.   Whether Simonson is Entitled to Qualified Immunity on Plaintiff's Illegal Entry Claim

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It is clearly established that individuals have a reasonable expectation of privacy in their homes. *Kyllo*, 533 U.S. at 37. Thus, the question of whether Simonson is entitled to qualified immunity for plaintiff's Fourth Amendment illegal entry claim turns upon whether "reasonable police officers . . . being confronted with the facts known to [the officer] at the time, could disagree as to the legality of entering the house without a warrant." *Martin v. Tatro*, No.04-CV-800, 2005 WL 2489905, at *7 (N.D.N.Y. Oct. 7, 2005). The Supreme Court has recently stated that "federal and state courts nationwide are sharply divided on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit[17] of that suspect." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (citing cases). In *Stanton*, the Supreme Court held that because the law in this area is unsettled, reasonable officers could disagree as to whether they could enter a home while in continuous pursuit of a misdemeanor suspect, and therefore an officer was entitled to qualified immunity from a Fourth Amendment illegal entry claim arising out of such an incident. *Id.* at 7. Here, as set out above, although the undisputed facts did not provide actual probable cause for Simonson

---

[17] "The hot pursuit doctrine applies when the pursuit is immediate and fairly continuous from the scene of the crime." *Webster v. City of New York*, 333 F. Supp. 2d 184, 195 (S.D.N.Y. 2004) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

to arrest plaintiff, they did provide "arguable probable cause." *See* Section IV(B)(ii). As in

*Stanton*, the crimes for which Simonson possessed arguable probable cause, and the crime for

which Marchand was arrested, were misdemeanors. As the Court has found that reasonable

officers could disagree as to whether Simonson was legally permitted to enter the home or

curtilage[18] without a warrant to arrest Marchand for a misdemeanor, Simonson is entitled to

qualified immunity and the Court will therefore grant defendants' Motion on plaintiff's Fourth

Amendment illegal entry claim.

2.    **Whether Defendants are Entitled to Summary Judgment on Plaintiff's Connecticut State Law Trespass Claim**

In Connecticut, the elements of a common law trespass claim are (1) plaintiff's

ownership or possessory interest in the land; (2) entry by the defendant that affects plaintiff's

exclusive possessory interest; (3) that such entry is intentional; and (4) resulting direct injury.

*City of Bristol v. Tilcon Minerals, Inc.*, 284 Conn. 55, 87 (Conn. Sup. Ct. 2007). Defendants do

not specifically challenge plaintiff's ability to establish any of these elements, but rather assert

that because Simonson was a licensee, plaintiff was unable to exclude him from the property.

[Rec. Doc. 167-1 at 30-31]. Under Connecticut common law, one who enters a property "in the

performance of a public duty under a permission created by law" is a licensee, not a trespasser.

*Roberts v. Rosenblatt*, 146 Conn. 110, 113 (Conn. Sup. Ct. 1959); *see also Segarra v. Elec.*

*Wholesalers, Inc.*, No. cv055001341S, 2007 WL 1676806, at *2 (Conn. Super. Ct., May 24,

2007) (stating that a police officer on private property pursuant to the exercise of his duties is

treated as a licensee). Whether an officer is a licensee "depends upon whether the officer[] had

---

[18] The parties disagree as to whether the cement staircase leading to the doorway of the house is an area in which Simonson had a reasonable expectation of privacy. [*See* Rec. Docs. 167-1 at 22; 170 at 30]. Assuming *arguendo* that the staircase was an area in which Marchand had a reasonable expectation of privacy, Simonson would still be entitled to qualified immunity as arguable probable cause to arrest Marchand existed from the time Marchand refused Simonson's first command to get off the property, which the parties agree was prior to the time Simonson set foot on the staircase. *See* Section IV(B)(ii).

an implied license to enter the [area], which in turn depends upon the purpose for which [he] entered." *Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013) (where officers' conduct violated plaintiff's Fourth Amendment rights they were not licensees). As set out above, there are genuine issues of material fact regarding the existence of actual probable cause that prevent the Court from resolving, on summary judgment, whether Simonson violated Marchand's Fourth Amendment right to be free from unreasonable searches and seizures on the night of the incident in question and thus whether Simonson was a licensee.

"'Qualified immunity' protects an official from liability under *federal* causes of action but is not generally understood to protect officials from claims based on state law." *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir. 2007). A similar doctrine exists under Connecticut common law. *See Freedman v. American Online*, 412 F. Supp. 2d 174, 188 (D. Conn. 2005). However, as defendants have not asserted that Simonson is entitled to the protection of this common law doctrine, the Court will not address it. As such, the Court will deny defendants' Motion on plaintiff's state law trespass claim.

## D.      Fourth Amendment Excessive Force

Defendants argue that they are entitled to summary judgment on plaintiff's Fourth Amendment excessive force claim because Simonson's use of force was objectively reasonable and, at a minimum, Simonson is entitled to qualified immunity because officers of reasonable competence could disagree as to whether his use of force was objectively reasonable. [Rec. Doc. 167-1 at 31-33].

### i.      Whether Simonson's Use of Force Was Objectively Reasonable

"The Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

"[A] police officer's use of force is excessive . . . if it is not objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent and motive." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). This evaluation entails a consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The amount of force used in this case has not been and cannot be established, based on the current record before the Court. As to Simonson's attempt to physically detain Marchand on the steps of the house, Marchand asserted in his affidavit that Simonson "forcefully ripped me off the top of the staircase by the back of my sweatshirt, down onto the driveway . . . [Simonson] was on top of my back and shoulder putting pressure on me, and forcing my face down towards the ground," apparently with so much force that Marchand feared Simonson "was going to kill me." [Marchand Aff., Rec. Doc. 170-2 ¶¶ 26-28]. Simonson has stated that he only "pulled [Marchand] off the steps to the ground with one hand . . . [and held] him on the ground" with one hand while requesting backup. [Simonson Dep., 77:11-78:7, Aug. 8, 2013, Rec. Doc. 167-14].

The circumstances of the second taser deployment are also in dispute. Simonson has testified that he told Marchand to "Get down, or, Get on the ground, twice prior to the second deployment," and that he used the taser on Marchand a second time, in part, because Marchand refused to comply with this order, but rather "was already standing at that point or . . . was still in the act of getting up." [Simonson Dep., 164:17-25, Aug. 8, 2013, Rec. Doc. 170-3]. However, Simonson acknowledges, and a review of the videotape reveals, that as he was allegedly ordering Marchand to the ground prior to the second taser deployment, he also stated "get over here." [*Id.*

at 164:13-19; Rec. Doc. 167-6]. Simonson testified that he is "not sure" if his command was directed at Marchand or Ms. Marchand, who was standing nearby. [Simonson Dep., 163:16-18, 164:13-19, Aug. 8, 2013, Rec. Doc. 170-3].

The amount of force employed and its reasonableness under the circumstances are questions of fact that must be resolved by a jury based on the evidence adduced at trial. Defendants' Motion on plaintiff's excessive force claim as it relates to the reasonableness of the force used will therefore be denied.

### ii.    Whether Simonson is Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim

As set out in Sections IV(B)(ii) and IV(C)(iv), *supra*, qualified immunity hinges on whether Simonson's actions were objectively reasonable in light of the established law at the time. "Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). Because the Court finds that there are questions of fact that are material which preclude a determination of the amount and reasonableness of Simonson's use of force, the Court is not able to resolve whether Simonson's actions were objectively reasonable in light of established law. Therefore, defendants' Motion on plaintiff's excessive force claim based on qualified immunity must and will be denied.

### E.    Fourteenth Amendment Substantive Due Process Claim

Defendants argue that plaintiff's substantive due process claim fails because (1) plaintiff improperly added a claim for substantive due process at the summary judgment stage and (2) there is an explicit textual source of protection against the government's alleged behavior, thereby foreclosing the possibility of a due process claim. [Rec. Doc. 167-1 at 34-35]. Plaintiff argues that the Court should construe count two of his amended complaint liberally to assert both

a false imprisonment claim and a Fourteenth Amendment substantive due process claim. [Rec. Doc. 170 at 9]. Furthermore, plaintiff asserts that there is not an explicit textual source of protection against all of the government behavior alleged by plaintiff in count two of his amended complaint and thus plaintiff can bring a Fourteenth Amendment claim based on that alleged government activity. [Rec. Doc. 170 at 10].

The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend XIV, § 1. The Due Process Clause "was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989)) (internal quotation marks omitted). From this came the doctrine of substantive due process, "which protects against government conduct that deprives people of protected rights and truly 'shocks the conscience' of the court." *Simons v. New York*, 472 F. Supp. 2d 253, 265 (N.D.N.Y. 2007) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Although substantive due process, on its face, encompasses a broad range of behavior, "the Supreme Court has repeatedly held that '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Bryant v. City of New York*, 404 F. 3d 128, 135 (2d Cir. 2005) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)).

Count two of plaintiff's amended complaint reads: "false imprisonment: I was handcuffed, never told the crime I had done. The [sic] brought to the police station. I was never read my rights until five minutes before they let me go home." [Rec. Doc. 23 at 5]. Plaintiff

agrees that there is no Fifth Amendment claim that can be brought in this case based on the

officer's alleged failure to read plaintiff *Miranda* warnings at a certain point in time [*See* Rec.

Doc. 170 at 8-9], but notes that the Supreme Court has stated:

> [o]ur views on the proper scope of the Fifth Amendment's Self Incrimination clause do
> not mean that police torture or other abuse that results in a confession is constitutionally
> permissible so long as the statements are not used at trial; it simply means that the
> Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-
> Incrimination Clause, would govern the inquiry.

*Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (plurality opinion). Plaintiff further asserts that

"[w]hile it is true that the Fourth Amendment does govern some of Plaintiff's claims, it does not

govern the claims related to the period of Marchand's incarceration. Rather, the Fourteenth

Amendment is the proper source of constitutional protection from being held and subjected to

overly coercive conditions." [Rec. Doc. 170 at 10]. Plaintiff alleges that count two of plaintiff's

amended complaint "mention[s] *Miranda* rights, not in a vacuum, but in the context of being

confined and held for a period of time that was coercive. The Plaintiff only mentioned *Miranda*

rights to highlight the coercive and abusive conditions of his detention." [*Id*. at 9]. Plaintiff

alleges that his Fourteenth Amendment Claim must stand because defendants have not

established that there is no genuine dispute of material fact as to whether the conditions of his

confinement were coercive and abusive. [*Id*. at 10].

    While it is true that defendants have not specifically asserted that there is no genuine

issue of material fact as to whether plaintiff could make the necessary showing to support a

Fourteenth Amendment claim based on "overly coercive conditions," based on the facts alleged

in count two of plaintiff's complaint, defendants were not put on notice that any unspecified

"overly coercive conditions" were a potential basis for a Fourteenth Amendment Claim. Unlike

in *Chavez*, plaintiff has made no allegation of "police torture or other abuse" apart from

defendants' alleged actions that violated plaintiff's Fourth Amendment rights. Plaintiff has not explained, either in his amended complaint or in his opposition to defendants' motion, why the police officer's alleged failure to give him *Miranda* warnings until a certain point in time, if true, was coercive or abusive. In cases where "what would serve to raise defendant's actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations," a Fourteenth Amendment claim is improper. *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). That is the case here. While it was the defendants' burden, as the moving party, to establish that there is no genuine issue of fact for trial, the defendants need not respond to arguments and factual allegations not set out in the amended complaint. Reading the amended complaint liberally, all the factual allegations made in count two of plaintiff's amended complaint are subsumed under claims of violations of more particularized Amendments and plaintiff alleges no facts, either in his amended complaint or opposition, that could be construed as the allegedly "overly coercive conditions" referred to in his opposition.[19] "[I]t is well established that the Fourth Amendment governs the procedures applied during some period following an arrest." *Bryant*, 404 F.3d at 136; *see also Graham*, 490 U.S. at 395 (analyzing a claim arising out of the use of force during an arrest solely under Fourth Amendment principles and not Fourteenth Amendment Due Process Clause principles). As the Fourth Amendment provides an explicit textual source of protection for "pretrial deprivations of liberty, including false arrest . . . it is the proper guide for analyzing plaintiff's constitutional claims, not the Fourteenth Amendment." *Simons*, 472 F. Supp. 2d at 265. The Court will

---

[19] To the extent plaintiff's argument regarding "overly coercive conditions" is an attempt to assert new factual allegations at the summary judgment stage in order to support a Fourteenth Amendment claim, it is improper. There is no reference to "overly coercive conditions" or any facts to support such a broad conclusion in count two of the amended complaint, nor has plaintiff filed a motion to amend his complaint to include any such additional allegations.

therefore grant defendants' Motion on plaintiff's Fourteenth Amendment Substantive Due Process claim.

## F.      Unopposed Claims

In addition to the claims set out and discussed above, defendants address plaintiff's state law harassment claim [Rec. Doc. 167-1 at 33] and what they interpret as a Fifth Amendment *Miranda* violation claim. [*Id*. at 4]. Plaintiff does not provide support for either of these claims in his opposition to defendant's motion.

### i.      State Law Harassment

Defendants argue that although "[c]laim 7 of [the] complaint is entitled 'harassment' . . . there is no such claim for civil harassment under either State law or Federal law." [*Id*. at 33]. In the parties' Second Joint Submittal in which the "attorneys [were] to list every remaining claim that is to be tried," pursuant to the Court's Jury Trial Procedure Order [Rec. Doc. 126 at 2], plaintiff listed a "state law harassment claim" [Rec. Doc. 144 at 4]. However, as noted, plaintiff's opposition to defendants' motion does not address this claim. "Federal Rule of Civil Procedure 56 provides that if a non-moving party fails to oppose a summary judgment motion, then 'summary judgment, *if appropriate*, shall be entered against' him." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). Plaintiff has failed to respond, present competent summary judgment evidence, or make argument indicating that a reasonable jury could find in plaintiff's favor on a state law harassment claim, to the extent such a claim might in fact exist. The Court, upon review of defendants' motion and the record before it, finds that defendants have met their burden of demonstrating that there is no material issue of fact left to be resolved on this purported claim and therefore defendants' Motion on plaintiff's state law harassment claim will be granted.

ii.      Fifth Amendment Claim

Defendants assert that "[c]laim 2 of the complaint alleges the officer did not read [plaintiff] his rights, which sounds like a Fifth Amendment claim." [Rec. Doc. 167-1 at 4]. Defendants argue that even if plaintiff has pled a Fifth Amendment claim, which they dispute, it must be dismissed on summary judgment because "[t]he Supreme Court has not established a civil cause of action for Miranda violations, instead finding that Fifth Amendment violations occur at trial." [*Id*.]. The Court agrees. *See U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("Although conduct by law enforcement officials prior to trial may ultimately impair [the Fifth Amendment right against self-incrimination], a constitutional violation occurs only at trial."). Additionally, plaintiff's opposition to defendants' motion does not address a potential Fifth Amendment claim and plaintiff did not list a Fifth Amendment claim in the parties' Second Joint Submittal [Rec. Doc. 144].[20] Plaintiff has not made a response, presented facts, or put forth any argument suggesting a triable issue of fact on a Fifth Amendment *Miranda* claim. The Court, upon review of the record and of defendants' motion, finds that defendants have met their burden of demonstrating that there is no material issue of fact remaining for trial. Assuming *arguendo* that defendants had not met their burden, the Court finds that plaintiff abandoned such a claim, to the extent it ever existed, pursuant to the Court's Jury Trial Procedure Order, which stated that "[a]ny claim not listed in the second joint submittal will be deemed abandoned by the Court." [Rec. Doc. 126 at 2]. Finding that there are no triable issues of fact and that in any event plaintiff has abandoned such claim, the Court will grant defendants' Motion on plaintiff's Fifth Amendment claim, to the extent such a claim may have been asserted and is still pending.

---

[20] The Second Submittal [Rec. Doc. 144] was filed more than two months prior to defendants' Motion for Summary Judgment.

Case 3:11-cv-00348-RNC   Document 184   Filed 04/28/14   Page 35 of 35


V.       CONCLUSION

For the foregoing reasons, judgment will be entered on defendants' Motion for Summary Judgment [Rec. Doc. 167] and the Motion will be GRANTED in part and DENIED in part. The Motion will be granted on plaintiff's claims, or attempted claims (1) against the Municipal Defendants, for any and all *Monell* claims; and (2) against officer Erik Simonson for Fourth Amendment false arrest, Fourth Amendment illegal entry, Fourteenth Amendment Substantive Due Process violation, state law harassment, and Fifth Amendment *Miranda* violation, the foregoing claims to be dismissed with prejudice. The Motion will be denied on plaintiff's claims of Fourth Amendment excessive force, brought pursuant to 42 U.S.C. § 1983, and Connecticut state law trespass.

Tucker L. Melançon
United States District Judge

April 28, 2014
Bridgeport, CT